1

1             IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
    Case No. 18-cv-02611-MSK-STV
3   _____

4   MATTHEW COOPER and MARY COOPER,

5        Plaintiffs,

6   vs.

7   INSTANT BRANDS, INC, et al.,

8        Defendants.
    _____
9

10          Proceedings before SCOTT T. VARHOLAK, United

11   States Magistrate Judge, United States District Court for

12   the District of Colorado, commencing at 1:31 p.m., May 14,

13   2019, in the United States Courthouse, Denver, Colorado.

14   _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                     APPEARANCES

19          GEORGE McLAUGHLIN, Attorney at Law, appearing for

20   the Plaintiff.

21          MARK DAVIS and DENNIS CALLAHAN, Attorneys at Law,

22   appearing for the Defendants.

23   _____

24                   DISCOVERY HEARING

25

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  This is 18-cv-2611.  Can I have

 6    entries of appearance, please.

 7              MR. MCLAUGHLIN:  George McLaughlin on behalf of

 8    the plaintiffs.

 9              THE COURT:  Good morning.

10              MR. CALLAHAN:  Dennis Callahan on behalf of

11    Instant Brands.

12              MR. DAVIS:  Mark Davis for the defendants.

13              THE COURT:  Good afternoon.

14              So we're here with regard to a discovery dispute.

15    I've read the position statement of the parties.  I'll hear

16    further argument.  Why don't I hear from plaintiff first

17    and, in particular, if you can address two questions.

18              The first is why -- if they've already produced

19    discovery with respect to 16 instances of defects, what more

20    you get from additional defects of the other products.

21              And, two, address the defendants' argument that

22    the discovery you're seeking, which deals with the top

23    opening under pressure, is dissimilar from the allegations

24    in this action, which is that it opened after the pressure

25    had dissipated.
```

1          So if you can address those two and then anything

2    else that you wish to raise.

3          MR. MCLAUGHLIN:   Sure.

4          Your Honor, the issue of the number of other

5    similar incidences is relevant for multiple purposes.   First

6    of all, the earliest incident that I'm aware of from the

7    documents which have been disclosed is a report from what

8    was disclosed to be consumer number -- or Customer Number

9    One on March 8th of 2016, and then there's a Customer Number

10   Two in August of 2016, and then after that, they seem to be

11   fairly closely spaced.   The gap between March and August is

12   a fairly long -- a long gap.

13         But when I took a look at the documents that have

14   been produced, and they were produced chronologically, so

15   Customer Number One is your earliest, Customer Number Two is

16   the second in time.   And when I got to Customer Number Two

17   and I looked at a -- a document that was produced that's

18   called Consumer Product Incident Report Form for Industry

19   from Health Canada and the documents produced, it begins at

20   page 332.   It discloses, on the second page of that

21   document, page 333, three lines down to the section titled

22   Incident Number 3, it says:   The company has investigated a

23   total of six reports concerning alleged injuries arising

24   from liquid discharge from the subject unit.

25         Well, they're apparently telling Health Canada

4

1    that at the time of Customer Number Two's claim, they've had

2    six prior claims.  Well, I'm interested in knowing when the

3    first claim was.  When did they first have notice of this

4    defect in the product?

5          THE COURT:  What's that relevant to?  What's it

6    relevant to when they first had notice?  What -- when was

7    the incident with your client?  What -- what date?

8          MR. MCLAUGHLIN:  What was -- I didn't hear your

9    question.

10         THE COURT:  The incident with your client, what

11    date?

12         MR. MCLAUGHLIN:  The incident was on September

13    27th, 2017.  The purchase was on July 12, 2016.  So I only

14    have notice, so far, of one incident before the date of

15    purchase.

16         I'm certainly curious to know if there are other

17    incidents before the date of purchase, because the company

18    receiving notice of an injury-causing defect is certainly

19    material to, you know, a number of the issues in our case:

20    The company's duty to take the product off the market before

21    it was even sold to this consumer, the duty to warn that

22    they were going to continue to sell it with the existing

23    mechanism, the duty of post-sale duty to warn.  What is the

24    magnitude of the product?

25         When you read the Health Canada reports, they

1    continue to deny, Well, this was a user mistake, this wasn't

2    a defect.

3            Well, it turns out documents recently produced

4    seem to argue against that, you know.  Just in the past few

5    weeks, when pressing for additional discovery, some

6    documents were produced on April 18 that were produced to me

7    almost -- well, mostly in Chinese, but I managed to get

8    interpretations of them.

9            And it appears that the company was aware of what

10   they refer to as a forced opening of duo (ph) series

11   products in these e-mails, as of December 8, 2016.  I don't

12   know how far back in time that went.  But certainly knowing

13   when they first became aware and receiving notice of these

14   claims is extremely material and relevant to us in this

15   case.

16           THE COURT:  To what claim?  To -- I am looking at

17   their answer here to see if they're asserting, as a defense,

18   that they did not have notice.  They don't assert that as a

19   defense.  So if -- if they're not asserting a notice-type

20   defense, what difference does it make when the first

21   incident occurred?

22           MR. MCLAUGHLIN:  Well, Your Honor, they're denying

23   that there's even a defect.

24           THE COURT:  I -- I get that and that's something

25   that you all will litigate.  But if they're not asserting a

1    notice defense, what difference does it make when the first

2    instant -- incident occurred?

3              MR. MCLAUGHLIN:  Well, I -- I hadn't thought about

4    that question at that level.  I -- I just --

5              THE COURT:  Because it's -- it's relevance is the

6    question -- is the question that I have.  If they're not

7    asserting, as a defense, that they had no notice of any

8    defect, then the question is:  To what element of your claim

9    or any defense that they are raising does this discovery go

10   to?  And it sounds like it may not go to any.

11             MR. MCLAUGHLIN:  Well, Your Honor, I think it does

12   because they're -- they're claiming that there's -- there's

13   no defect at all; therefore, there is no notice.  There's --

14   anything they received doesn't constitute notice because it

15   wasn't a defect.

16             You know, we -- I'm kind of at a loss to

17   articulate what I'm saying here, Judge, but the --

18             THE COURT:  Okay.

19             MR. MCLAUGHLIN:  -- the -- the fact of when you

20   first become aware that people are being injured by this

21   product, by this specific mechanism, and the lengths of time

22   that you then have to assess what that -- whether or not it

23   is a defect and what that defect is and how to remedy it,

24   which they apparently did determine by December, they should

25   be remedying, I think that -- that is all relevant to -- and

 1    material evidence that should come in.  That on such and

 2    such a date, this company became aware that there was a

 3    problem.  And this wasn't just a -- a deniable, Well, that

 4    must be customer error.  But we had incident after incident

 5    after incident by the exact same mechanism of failure, which

 6    prior to some point in time, didn't exist at all.

 7            Because it does appear to me that, you know, from

 8    the evidence that I have gotten in discovery, that this

 9    product first went on the market in December of 2013 and

10    yet, we have this period of time of, all of '17 and some of

11    '16, when there are absolutely no claims.  And then

12    suddenly, in the middle of 2016, we start seeing claim,

13    claim, claim, claim, claim.

14            Well, you know, what was it that changed?  When

15    did they discover that?  Why -- you know, what caused it?

16            So, you know, I think the -- certainly, the note

17    -- the first notice of defect with this particular design is

18    relevant and, frankly, all of the defects after that point

19    in time are certainly relevant for multiple reasons and not

20    just as to the date of the occurrence, because they continue

21    to deny defect.

22            Notice of incidents and the reports of other

23    similar incidents after the date of this incident, they were

24    pots that were the exact same design, maybe made in the same

25    lot as my client's pot, that becomes relevant evidence to

1   prove defect, which they continue to deny.  They do not

2   admit that the product is defective.

3            THE COURT:  Let me ask the second question, which

4   is:  If your argument is that the problem with this product

5   was it opened after the pressure dissipated --

6            MR. MCLAUGHLIN:  That's not my argument, Judge.

7            THE COURT:  Okay.  Okay.

8            What is -- what is the --

9            MR. MCLAUGHLIN:  The argument is that it, at

10  least, appeared to the consumer that the pressure had

11  dissipated, if it had not, in fact, dissipated and then

12  subsequently rebuilt.  We do not contend that this product

13  opened without pressure.  It absolutely opened under

14  pressure.

15           That is our claim.  And each of these other 16

16  similar incidents are almost identical to this claim, where

17  the consumer claims that -- at least, they perceive that the

18  product had no pressure in it and yet, it managed to open.

19           And, you know, we're way -- we're a long way off

20  from expert reports, but experts in this case will testify

21  -- I make a proffer to the Court -- that, under certain

22  circumstances, you can depressurize the product and it

23  repressurizes because the lid is still on and the consumer

24  thinks that it's depressurized because, when they saw it, it

25  was depressurized.  But now they're trying to open the lid,

1    the pressure has built back up, they're unaware of it.  And

2    the safety mechanism which is supposed to prevent the lid

3    opening under any circumstance when it's under pressure

4    fails to operate, fails to protect the consumer and, boom,

5    you open the pot and the -- the contents spew all over the

6    place.

7              THE COURT:  Okay.  Let me hear from defendants on

8    this and, in particular, how difficult it truly is to find

9    out other instances of defect.

10             It sounds like, from the one document that was

11   produced, that they are aware and, presumably readily

12   available, at least five other instances.  Because if there

13   -- if this is Person Number Two and they're saying on Person

14   Number Two, we're aware of six other incidents, Person

15   Number One plaintiff would already have.  That's -- it makes

16   five other incidents that somewhere, the defendant is aware

17   of five other incidents and, presumably, has the

18   documentation on those other five that would be fairly easy

19   to turn over.

20             MR. DAVIS:  I think -- I'm not completely sure

21   standing here, but my belief is our initial discovery

22   response was limited to the version two product.

23             THE COURT:  Okay.

24             MR. DAVIS:  We've since agreed to produce

25   documentation regarding -- relating to the prior version,

1   version one.  That might explain those other claims or those

2   other claims of problem operating it.

3           THE COURT:  In other words, those five others may

4   be in version one?

5           MR. DAVIS:  Given the date range, I'm assuming

6   that's true because that's before version three.

7           THE COURT:  Right.

8           MR. DAVIS:  I don't know, I haven't seen those

9   documents yet.  I hope to have them by the end of the week,

10  that's my -- been promised to me.

11          THE COURT:  Okay.

12          MR. DAVIS:  I've told Mr. McLaughlin we were -- we

13  were going back -- circling back to look for those V1

14  document -- documents on the V1 product.

15          THE COURT:  Okay.

16          MR. DAVIS:  So that could explain that.

17          THE COURT:  Okay.  So then tell me what is the

18  burden of looking at other products with similar

19  substantially identical mechanisms?

20          MR. DAVIS:  Well, I think the burden -- and it's

21  not just a burden, it's proportionality to the issues at

22  stake in this case and --

23          THE COURT:  Well, okay.  But if -- it's -- I mean

24  part of the argument that was made was this is a different

25  product.  But if the safety mechanism on the cap is exactly

1    the same, it's just a -- there are other differences in the

2    models and I mean, I don't know -- I don't know these

3    products.  But if it's, you know, the safety mechanism is

4    identical, then I see the relevance to it.

5         Now, there may be a burdensome aspect to it, but

6    that's what I'm trying to get to, is what exactly is the

7    burdens that I can weigh it against the relevance to

8    determine whether it is proportional discovery.

9         MR. DAVIS:  Well, there has been a change in the

10   lid lock from the version two to the version three.

11        THE COURT:  Okay.

12        MR. DAVIS:  So it's not identical.  Also, with

13   respect to the pot generally, although the lid may be

14   interchangeable, the interworkings of the lid might not be.

15   And that's the -- I mean, the version two and the version

16   three lids look essentially the same, but they operate

17   differently internally.  It wouldn't be a -- wouldn't be

18   observable to the consumer that the product operates

19   differently.

20        Also, the other products have different operating

21   temperatures and pressures.  I mean, they have -- they're

22   different sizes so the -- the forces applied, if it is a

23   forced opening incident, it could be different, it could be

24   impactful.  So there are differences in the product that

25   could make a difference.

1          Also, I want to point out in just the V2 product,

2    there's 100 -- there's been 100 and -- well, 1 point --

3    excuse me.  Yeah, 1.5 million products sold.  Some of these

4    products are used, at least based on what we've seen, you

5    know, multiple times a week.  It might be -- some of these

6    pots might have been used and opened hundreds of times.  We

7    might have hundreds of millions of openings without

8    incident.

9          And, so far, we've produced 16, I think there's a

10   handful of others for the V1 product, but it -- to say that

11   this demonstrates a defect, why is this defect -- and we

12   deny there is a defect -- Instant Pot does.  What is

13   different about those interactions, those consumers and

14   those circumstances, that is different than the other

15   hundred million perfectly safe, perfectly, you know --

16          THE COURT:  Well, those openings --

17          MR. DAVIS:  -- normal operation?

18          THE COURT:  That's what plaintiff is trying to

19   figure out.  I mean, that's -- that's what they're trying to

20   figure out.

21          MR. DAVIS:  But to go -- to go back and -- I mean

22   -- this is important to the burden:  To go back and figure

23   that out, I mean, plaintiff's discovery to date wants every

24   product, without regard to time, without regard to

25   circumstance, and we're going to -- he's asked for all these

13

1     pots to examine.  Presumably, he's going to want to take

2     depositions of all of these people, or some of them.

3            I mean, this is -- he's -- as I stated in my

4     position, he wants to litigate all the other cases too.

5            THE COURT:  Well, but --

6            MR. DAVIS:  The Court and the discovery should be

7     focused on the issues here.  Here, the pressure relief valve

8     -- well, they released the pressure.  It's like -- look at

9     it as a -- as a bicycle tire.

10           You would open the valve on the bicycle tire, the

11    pressure is released.  This unit has two valves, actually.

12    The pressure release valve, which they released.  Steam was

13    released from it, it wasn't clogged, it stopped releasing

14    steam.  These are allegations directly from the complaint.

15    The float valve dropped.

16           Now, we have two openings between the inside of

17    the pot and the outside air.  It's like a -- now it's a

18    bicycle tire with a valve removed and a puncture.  The

19    pressure on the inside and the pressure on the outside,

20    according to physics, is the same --

21           THE COURT:  Well, but --

22           MR. CALLAHAN:  -- it's not under pressure at that

23    point in time, so to explore --

24           THE COURT:  Now you're litigating --

25           MR. CALLAHAN:  -- cases involving forced openings

1  where someone opened the product and forced it open and some

2  of the allegations from those prior complaints, that's --

3  that's what they said.  Oh, I opened it -- I forced it open.

4  It was too soon.

5          I mean, those are necessarily unrelated from this

6  particular claim.

7          THE COURT:  Well, I don't think he's asking for

8  incidents where the consumer admitted to doing something

9  wrong.  I think he's looking for incidents with the same

10 security mechanism where there's an allegation that's made

11 that the security mechanism failed.

12         MR. DAVIS:  But if the float valve drops, that

13 unlocks the pot.  It's not a failure of the mechanism; it's

14 a proper functioning of the mechanism.

15         THE COURT:  Well, and again, I'm not getting into

16 the merits of the case.  I think what he's asking for is

17 instances in which an allegation similar to what is being

18 alleged here has been alleged by another customer with

19 regard to this same type of lid, and I think that's

20 relevant.

21         You may disagree with the theory, but I -- I think

22 it's relevant.  What I have to weigh is that level of

23 relevance versus the burden of producing.  I haven't heard

24 anything about --

25         MR. DAVIS:  Okay.  I'll address that.

1            THE COURT:  -- the burden.

2            MR. DAVIS:  What I can tell you is to -- the first

3    round of discovery, my client spent about $25,000

4    collecting, searching, reviewing and producing those

5    documents.  That doesn't include my time or my office's time

6    as well.

7            THE COURT:  How did they go about -- I mean, this

8    is what I need to know is, is there an electronic file

9    somewhere of all allegations of, you know --

10           MR. DAVIS:  There are multiple --

11           THE COURT:  -- malfunction?

12           MR. DAVIS:  There are multiple sources of these

13   documents which were necessary to be reviewed.  There is a

14   ticket system where, when people make a complaint, it's

15   noted and there's an electronic system that keeps track of

16   that.

17           Using that, they identified related documents,

18   either through e-mail or through Health Canada reports or

19   other documentations, and they had to go search those

20   separately.  There's not one file cabinet that has claim

21   one, claim two, claim whatever.

22           THE COURT:  How difficult would it be to just go

23   through the Health Canada reports?

24           MR. DAVIS:  The Health Canada reports?

25           THE COURT:  Yeah.  In other words, that may be a

```
 1    more narrowed scope where I'm assuming that's something they

 2    had to file with a regulatory agency where if it rose to the

 3    level where they had to file something with the regulatory

 4    agency, it -- it suggests something more, or at least it

 5    suggests they went to a further step.  And that may be a --

 6    a more readily searchable database for them in order to --

 7    to find out whether there -- if similar allegations were

 8    made.

 9            MR. DAVIS:  It would be less burdensome to do

10    that --

11            THE COURT:  Okay.

12            MR. DAVIS:  -- because that's one of multiple

13    pieces.  I don't have that -- I'm trying --

14            THE COURT:  Sure.

15            MR. DAVIS:  I requested how much time did you

16    spend on the first batch, that first 16, and was given that

17    number.

18            THE COURT:  Okay.

19            MR. DAVIS:  I -- I didn't try to parse out --

20            THE COURT:  Sure.

21            MR. DAVIS:  -- each individual piece.  I'm sorry.

22            THE COURT:  No, no, no.  That's all right.

23            MR. DAVIS:  I could ask my client and get back to

24    you on that point, I guess.

25            THE COURT:  Here's what I'm inclined to do and
```

1   then I'll allow either side to make any further argument:

2   I'm inclined to require them to produce documents that have

3   the same, or substantially similar, lids as the one involved

4   here where they had to make a -- is it Health Canada?

5            MR. DAVIS:  It is Health Canada, yes.

6            THE COURT:  -- Health Canada report in response to

7   an allegation of the lid malfunctioning in a way similar to

8   what occurred here.  I want to put some timeframe on this

9   because I don't want it to go back -- I don't know how long

10  these lids have been in existence, and I don't -- I don't

11  want you have to go back 20 years to do it.

12           When -- when did this type of lid start being

13  used, do you know?

14           MR. DAVIS:  I think the product came on the market

15  in 2012.

16           THE COURT:  And the incident in this case is 2017;

17  is that right?

18           MR. DAVIS:  September of 2017, I believe.

19           THE COURT:  Why don't I say from the beginning of

20  September of 2015 forward.  And I put that time limitation,

21  one, to try to limit the --

22           MR. DAVIS:  Forward until when, Your Honor?

23           THE COURT:  I think forward until now.

24           I put that time limitation because the

25  representation here today is there weren't many of these

1    going back.  It was very sporadic until about 2016 when it

2    started happening more.  So I think if it were sporadic, I

3    think going back two years is sufficient to get plaintiff

4    the information the plaintiff needs.

5            If, when you go back --

6            MR. DAVIS:  Might -- Instant Brands -- I'm sorry,

7    Instant Brands original production was not limited going

8    back in time.  The V1 product may fill in some gaps.

9            THE COURT:  I get that.  It -- for this expanded

10   area, I'm only having you go back two years.

11           If, after you go back to your client, you learn

12   that this is an extraordinarily difficult task to produce,

13   you can consult with plaintiffs' counsel.  If you two can

14   work something out with respect to that, that's great.  If

15   you can't, go through my discovery process again and I will

16   reconsider once I have the information from you as to

17   exactly how difficult this would be to find this out.

18           MR. DAVIS:  The Health Canada report?

19           THE COURT:  The Health Canada report.

20           MR. DAVIS:  May I ask for clarification?  Maybe

21   you can't answer this.

22           THE COURT:  Sure.

23           MR. DAVIS:  When you say "substantially similar

24   lid," what does that mean, because there was -- there was a

25   change to the locking mechanism.  Mr. McLaughlin referred it

1    to during his argument.

2           THE COURT:  I think it would be the locking

3    mechanism -- I don't know plan to make an argument on this.

4    But I think it would be the locking mechanism that was in

5    place for the pot the plaintiff purchased.

6           MR. DAVIS:  Okay.

7           THE COURT:  But I will let counsel for plaintiff,

8    if they think that's too limited, make an argument.

9           MR. McLAUGHLIN:  I would like speak, but I prefer

10   to speak from the podium --

11          THE COURT:  Sure.

12          MR. McLAUGHLIN:  -- when my --

13          MR. DAVIS:  Do you have any other questions for

14   me, Your Honor?  Should I step aside?

15          THE COURT:  I do not.  Yes, you can step aside.

16          MR. McLAUGHLIN:  I would like to bring a couple

17   facts to Your Honor's attention relative to the timeline.

18          From documents produced, it appears that the UL

19   certification, the Underwriter's Laboratory's listing for

20   the products in issue, what we call the duo series products,

21   was issued on September 27, 2013.  And according to the

22   Health Canada reports, the first importation began of these

23   duo series products on December 2 of 2013.

24          I would ask that the Court expand the timeframe to

25   the beginning of 2015 because now we have picked up what

1   appear to be all of these products which have this

2   mechanism.

3           It's just one year and, hypothetically, this is a

4   new product coming on the market, I don't know what their

5   sales were, but sales ramp up, there may not have been a lot

6   to do there.

7           I would request that the Court reconsider the

8   cut-off date to be the beginning of 2014.

9           THE COURT:  '14 or '15?

10          MR. McLAUGHLIN:  '14, so we pick up -- because,

11  right now, it's the beginning of '15, so we would be

12  expanding it to 2014 by one more year.

13          As far as the locking mechanism and the argument,

14  well, it's different.  I mean, again, I just got these

15  translated from Chinese, but from the translation I have and

16  from the pictures, it appears that what was done, Your

17  Honor, is there's -- there's a little catch -- this is --

18  this is the link that we contend can be used on any number

19  of these pots in this.  And this little metal catch, I have

20  multiple copies, if I can approach the bench if you would

21  like to see it.

22          THE COURT:  Sure.

23          MR. DAVIS:  Just for the record, I'm not

24  concerned, Your Honor, but I think that's marked

25  "Confidential."

1            THE COURT:  Okay, that's fine.

2            MR. McLAUGHLIN:  It is.  This is a confidential

3   document.  It should --

4            THE COURT:  I will give it --

5            MR. McLAUGHLIN:  I ask that it not be put into the

6   record.

7            THE COURT:  I will -- I will give it back at the

8   end of the hearing.

9            MR. McLAUGHLIN:  But that -- that little metal

10  thing with the hole in it and the spring on the other end

11  that you see, it's inside this lid and it's part of the,

12  what's called the -- what did they call it?  They call it

13  the -- the -- lid lock assembly, I believe is the word that

14  UL uses.

15           And it appears that all that was done is, Well, we

16  need to make this thing out of a different metal that's

17  stronger, we need to make it a little bit wider and we need

18  to put the reinforcement notch up rather than down.  But

19  it's the exact same design.  They have just changed one

20  aspect of the -- how sturdy that particular piece is that

21  would then operate more effectively, in theory, to prevent

22  the lid lock so -- or the lid from opening when it's not

23  supposed to open because it is giving indications it's in

24  the locked position.

25           And then, of course, I mean, one issue becomes,

1   Your Honor, Well, did this fix it?  I suspect that it did,

2   but knowing that after a certain point in time, well, there

3   aren't any other claims from this new design of product,

4   this new design of the class, that would be, you know,

5   relevant information for the experts to know in this case

6   that once this change was made, yes, the claims stopped.

7   Kind of the proof being in the pudding.

8           THE COURT:  Admissibility may be a problem with --

9   under the theory that you can't get a change in.

10          MR. McLAUGHLIN:  Yes, subsequent remedial

11  measure --

12          THE COURT:  Right.

13          MR. McLAUGHLIN:  -- issue, correct.

14          So, while it may not be admissible in front of a

15  jury, it would certainly be evidence relevant for the

16  experts to consider as to whether or not their opinions are

17  valid or not.  If you propose a fix and it works, well,

18  okay, kind of validates your hypothetical that there was the

19  problem.

20          And it appears, from the Chinese documents that we

21  do have, that at least this company perceived it was the

22  problem and made this proposal in the documents that we see

23  to beef up this device.

24          THE COURT:  Okay.

25          MR. McLAUGHLIN:  I think that's the only --

1         THE COURT:  Okay.

2         MR. McLAUGHLIN:  -- other thing.

3         I do want to address one issue that counsel

4    briefly mentioned, Your Honor didn't, but if you are not

5    interested in it, I will drop it, which is the

6    proportionality issue.

7         Because it was in their statement that while, this

8    little girl only had $7000 of medical bills, and she was

9    never really, you know, treated much after that.

10        Your Honor, this is a serious injury case.  This

11   girl was scarred horribly, suffered greatly and is scarred

12   for the rest of her life.  Just because she doesn't have a

13   lot of medical bills to say, Well, this claim isn't worth

14   putting in time and effort to develop the evidence, the

15   injury was serious.  It just didn't amount to a large

16   medical bill, but --

17        THE COURT:  Okay.

18        MR. McLAUGHLIN:  -- it did amount to a serious

19   injury and it did result in a permanent injury, which to

20   this day this girl has.  And she is going to have to protect

21   herself from sun exposure and obvious pigmentation changes

22   for the rest of her life.

23        So the proportionality argument, well, this just

24   isn't that big a case, really doesn't stand up when you see

25   the evidence of the injury.

1            THE COURT:  Okay.  Here's what I'm going to do.

2    I'm going to keep the original two-year frame.

3            I think that that should provide sufficient

4    information for plaintiff.  But I will require the

5    production for both the lid -- the locking mechanism pots

6    that were in existence when plaintiff bought it, as well as

7    the ones that came in after the change.

8            Because I -- I -- I think there may be an

9    admissibility problem, but I think that if suddenly, the

10   change occurs and you have, before the change, 50 of these

11   malfunctions, and after the change, none, I think it's at

12   least relevant as to whether or not this was a defect and a

13   defect that was cured by the change.

14           Again, there may be an admissibility problem, but

15   that will be for Judge -- who do we have on this? -- Krieger

16   to decide at that point.  Okay.

17           MR. DAVIS:  May I ask for another clarification,

18   Your Honor?

19           THE COURT:  Sure, sure.

20           MR. DAVIS:  On the substantially similar claims,

21   today Mr. McLaughlin stated the pressure -- he agrees the

22   pressure valve dropped and now it's a repressurized

23   situation, I -- I -- I don't know what "substantially

24   similar" is, given his -- the allegations from the complaint

25   and the allegations of his statements here today.

1            THE COURT:  I will define it.

2            It's any complaint raised by a customer who

3    asserts that they were injured as a result of the lid

4    malfunctioning in some way and that should be broad enough

5    to include substantially similar.  And I don't think that

6    that makes it any more difficult to search than this.  Okay.

7            Let me give you back your confidential document

8    because I certainly don't want to have to deal with keeping

9    it.

10           Anything further we can do here today?

11           MR. DAVIS:  Will there be an order -- written

12   order?

13           THE COURT:  There will be a minute order that will

14   come out, yes.

15           MR. DAVIS:  Okay.

16           THE COURT:  Okay.

17           MR. McLAUGHLIN:  Your Honor, we have some

18   percolating additional discovery issues.  They weren't on --

19   teed up for today.  Do you want us to re-tee them up in a

20   couple of days?

21           THE COURT:  Yes, yes.  All right, thank you, we

22   will be in recess.

23           (Whereupon, the within hearing was then in

24   conclusion at 2:03 p.m.)

25

```
1                    CERTIFICATE OF TRANSCRIBER

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                     May 22, 2019

8    Signature of Transcriber           Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```